In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-4074

RASUL FREELAIN,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF OAK PARK and
DINA VARDAL,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-CV-3682 — **Manish S. Shah**, *Judge.*

ARGUED DECEMBER 6, 2017 — DECIDED APRIL 30, 2018

Before WOOD, *Chief Judge*, and EASTERBROOK and
HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiff Rasul Freelain worked
as a police officer in the Village of Oak Park, Illinois for five
years before he claims another officer began harassing him.
After an incident in 2012 prompted him to report the miscon-
duct, Freelain began experiencing migraine headaches and

other medical conditions that he has attributed to stress related to the harassment. To deal with these medical issues, Freelain took significant periods of time off work.

As Freelain began taking time off, tensions rose between him and the police department. Freelain claims that as a result of his medical condition and use of leave time, the village retaliated against him in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. The district court granted summary judgment in favor of the village on all claims. We affirm. The undisputed facts show that the acts that Freelain has identified as retaliation would not discourage a reasonable employee from exercising his or her rights under these statutes.

I.    *Facts for Purposes of Summary Judgment*

Because Freelain appeals from a grant of summary judgment, we must view the evidence in the light reasonably most favorable to him, as the non-moving party, and we must give him the benefit of conflicts in the evidence. *Greengrass v. Int'l Monetary Systems Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015). That means we are not vouching for the objective truth of every fact that we must assume to be true for purposes of the appeal. *KDC Foods, Inc. v. Gray, Plant, Mooty, Mooty & Bennett, P.A.*, 763 F.3d 743, 746 (7th Cir. 2014).

Plaintiff Rasul Freelain began working as a police officer for the Village of Oak Park in 2002. In 2007, Sergeant Dina Vardal made what Freelain perceived as inappropriate and unwelcome sexual advances toward him. According to Freelain, he was not the only person subjected to sexual har-

assment by Vardal. After Freelain rebuffed Vardal's invitations to parties at her house, he claims, she escalated a pattern of harassment and hypercriticism of his performance.

In April 2012, Freelain says, Vardal suggested giving him "one on one training" during her "personal time." This offer and a later call from Vardal to Freelain on his personal telephone prompted Freelain to file a sexual harassment complaint with the village against Vardal on May 9, 2012. Ten days after this initial report, Vardal shoved Freelain into the side of his squad car while shouting "look out! look out!" During this altercation, Freelain was on duty but Vardal was not. Freelain amended his harassment complaint to include this incident and sought the village's support (without success) to pursue criminal battery charges against Vardal.

The village retained an outside agency to investigate Freelain's complaint. The investigator interviewed only Freelain and concluded the investigation in June 2012, finding that his claim was unsubstantiated. Despite the quick disposition of the investigation, Freelain did not know the outcome until September 2012 when he returned to work. In the interim, before learning the results of the investigation, Freelain had begun to suffer migraines, sleeplessness, and stress that he attributed to the ongoing investigation and the continued presence of Vardal. In late August 2012, he began taking days off because of his ailments. By the end of September, Freelain had used 20 days of leave to deal with his symptoms.

Freelain's physician cleared him to return to work on September 28, 2012. Freelain then met with Police Chief Richard Tanksley, who told Freelain that the village would take no action against Vardal in response to Freelain's complaint. Tanksley also told Freelain he would need to pass a psychological

examination before returning to duty. More than six weeks passed before the department cleared Freelain to return to work in November 2012.

These extended absences drained Freelain's accumulated days of paid sick leave. Nevertheless, he received full paychecks for all pay periods except the very last pay period before the village cleared him to return to work. The village reduced Freelain's pay for that final period by a few hours that he remained absent after exhausting his paid sick leave. During his extended absence while awaiting clearance from the psychological test results, Freelain complained that the village should reclassify his absence as administrative leave and pay him without draining his sick leave. The village agreed, but a few months passed before it readjusted Freelain's sick leave balance and compensated him for unpaid hours during the administrative leave.

Shortly after he returned to work in late 2012 but before his sick leave balance was adjusted, Freelain's wife was diagnosed with cancer. To care for her and his family during this time, Freelain requested and received additional FMLA leave. But with his sick leave balance depleted, Freelain faced a difficult choice—take unpaid time off work to help his family, or continue working while his wife and family dealt with her illness. Throughout that ordeal, we assume, Freelain struggled to balance his obligations by working full-time but taking time off when his wife had surgery or other urgent needs.

The police department leadership, we must assume, did not always respond to Freelain's absences efficiently or with kind understanding. Freelain says that Chief Tanksley smirked at him when informing him that he could not return to work until he passed a psychological evaluation. Another

supervisor reportedly told Freelain that Tanksley was "tired of" him. The police department often required Freelain to provide detailed documentation for his leave and misclassified portions of his leave. Efforts to approve his leave requests and to remedy misclassifications bordered on dilatory.

Freelain filed a charge with the Equal Employment Opportunity Commission alleging disability discrimination and retaliation in April 2013. He filed suit against the Village of Oak Park and Vardal the following month. In his second amended complaint, Freelain asserted various claims under the Family and Medical Leave Act and the Americans with Disabilities Act. The district court granted summary judgment for the village on these federal claims and dismissed remaining state law claims against Vardal without prejudice.

Freelain appeals the district court's rulings on his retaliation claims under the FMLA and the ADA. In particular, he disputes the district court's findings that he failed to identify any materially adverse actions taken against him and failed to establish a causal nexus between any purported adverse actions and his protected activity under the statutes. Freelain argues that the village took three materially adverse actions to retaliate against him: (1) initially misclassifying his sick leave; (2) requiring him to undergo a psychological evaluation; and (3) waiting three months before approving his request to engage in outside employment for a colleague's private security company.

We review *de novo* the district court's grant of summary judgment and draw all reasonable factual inferences from the record in Freelain's favor. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Oak Park is entitled to

summary judgment only if there is no genuine dispute of material fact and the village is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

II.  *Analysis*

   A.  *The FMLA and ADA Generally*

The Family and Medical Leave Act and the Americans with Disabilities Act are legally distinct, but in cases claiming unlawful retaliation, the analyses under the two separate acts overlap. The ADA prohibits covered employers from discriminating against individuals with disabilities. 42 U.S.C. § 12112(a). The FMLA grants qualified employees twelve weeks of leave during a twelve-month period for qualifying health reasons. 29 U.S.C. § 2612(a)(1). Congress defined in expansive terms both the qualifying health reasons triggering the FMLA and the disabilities protected by the ADA. *Id.* (defining qualifying health reasons); 42 U.S.C. § 12102(1) (defining disability). We assume that both statutes covered Freelain's situation in 2012 and 2013.

Both the FMLA and the ADA prohibit employers from retaliating against employees who assert their statutory rights. 29 U.S.C. § 2615; 42 U.S.C. § 12203. Here, Freelain's ADA and FMLA retaliation claims arise from the same situation: his medical ailments following Vardal's alleged harassment. Whether the village retaliated against him because of a medical disability or because he took leave to deal with that disability does not matter. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) ("We evaluate a claim of FMLA retaliation the same way that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII."); see also *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th

Cir. 2009). To avoid repetition, we address the ADA and FMLA claims together.

We must first, though, address the boundaries of the FMLA because they shape our analysis of Freelain's claims. Unlike workers' rights laws in many other countries, the FMLA does not require employers to pay employees when they are on family or medical leave. See 29 U.S.C. § 2612(a), (c), and (d). The law permits an employer to drain any paid leave it provides to its employees while they use FMLA leave. § 2612(d). These details matter because so many of Freelain's arguments are based on his frustration with the village for taking actions that drained his *paid* leave account. Freelain was allowed to take all the unpaid leave he wanted or needed. His claims in this lawsuit assert that doing exactly what the FMLA allows—placing an employee on unpaid leave—violated the anti-retaliation provisions of the FMLA and ADA. As we view the case, though, granting an employee's FMLA rights to unpaid leave consistent with the statute's explicit terms cannot constitute a retaliatory adverse action under the FMLA itself or under the ADA, at least without evidence that his employer deviated from its normal paid leave practices and targeted him for unpaid leave because he asserted his statutory rights.[1]

---

[1] A regulation under the FMLA requires an employer to adhere to its family or medical leave policies that are more generous than the FMLA itself. 29 C.F.R. § 825.700. Freelain has not offered evidence of such a deviation here.

B.  *Retaliation Doctrine Under the Statutes*

Retaliation claims under the FMLA and ADA require three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action. *Pagel v. TIN, Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). Freelain engaged in statutorily protected activity by using his FMLA leave because of his medical ailments. Freelain has failed, however, to come forward with evidence that the village took any materially adverse actions against him.

The category of actions prohibited by the statutes' anti-retaliation provisions is broader than the category of adverse employment actions prohibited by the statutes' anti-discrimination provisions. See *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008) (FMLA), citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006) (Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). This difference makes sense because the provisions banning retaliation create a zone of protection around the fundamental anti-discrimination principle so that employers do not chill worker conduct seeking to vindicate that principle. *Burlington Northern*, 548 U.S. at 63 (anti-discrimination provisions protect people "based on who they are, *i.e.*, their status" while anti-retaliation provision "seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct").

To count an employer's action as materially adverse, a plaintiff must show that the action would have "dissuaded a reasonable worker from" engaging in protected activity. *Id.* at 68 (citation omitted). This test uses an objective standard,

based on how a reasonable employee might react, not the plaintiff's subjective feelings. An employee who is particularly sensitive to an employer's slights receives no greater protection than one who is able to shrug them off. See *id.*

Though the inquiry does not reach the personal *feelings* of individual employees, the inquiry does account for the personal *circumstances* of those employees. *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) ("seeking out devices that would be harmless to most people but do real damage to select targets" can be "materially adverse"). For example, a schedule change "may make little difference to many workers, but may matter enormously to a young mother with school-age children," so the inquiry adjusts accordingly. See *Burlington Northern*, 548 U.S. at 69, citing *Washington*, 420 F.3d at 662. The question is whether a reasonable person in the plaintiff's circumstances would be dissuaded from engaging in protected activity.

### 1. *Leave Classifications*

Freelain's first claim fails because the misclassifications of his leave time that he identifies are not materially adverse. This claim involves two classification of leave for two different periods: first, his time off in August and September 2012, and second the ensuing time off while he waited for clearance after his psychological evaluation.

The village classified as "self-sick" Freelain's August and September 2012 absence. Under this classification, the village paid Freelain for his time off but deducted the time off from his sick time balance. Freelain argues that this time should have been classified as "sick accident" time because his ailments qualified as a work-related injury in that they resulted

from Vardal's harassment of him on the job. Under the "sick accident" classification, the village would not have deducted time from Freelain's paid leave account.

We need not consider in detail the village's methods for classifying work-related injuries or ailments. The harm Freelain claims to have suffered—diminishing his paid sick leave—is wholly consistent with the terms of the FMLA. Put slightly differently, a reasonable worker would not be dissuaded from using FMLA on pain of losing sick days. The FMLA itself gives employers the right to count FMLA leave against paid sick days and the right not to pay employees for time they are on leave. Cf. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90 (2002) (rejecting a federal regulation that required twelve weeks of FMLA leave to run after employer's more generous, voluntary leave policy if employer failed to notify workers of intention to run FMLA-mandated leave concurrently with the employer's more generous leave).

When Freelain tried to return to work on September 28, 2012, Chief Tanksley ordered him to undergo a psychological evaluation and to await clearance before returning for duty. That took nearly seven weeks. During that period, the village continued to classify Freelain's leave as "self-sick" and deducted that time from his bank of sick days. Freelain argued that this time should be classified instead as paid "administrative leave" since the village required his absence. On November 10, 2012, the village agreed to reclassify the leave, but it took another two months to carry out that decision by actually crediting Freelain's sick leave balance and paying him for the time he had remained on leave after exhausting his paid leave.

Again, Freelain's claim founders against the terms of the FMLA and the ADA. Provided that the employer acts in good faith, the FMLA limits the employee's recovery to the "compensation denied or lost … by reason of the violation" or the "actual monetary losses sustained … as a direct result of the violation." 29 U.S.C. § 2617(a)(1)(A). Similarly, the ADA limits recovery to compensatory damages such as backpay unless the plaintiff can show malice or reckless indifference. 42 U.S.C. § 1981a(a)(2), (b)(1).

Here, nothing in the facts developed by Freelain approaches malice or recklessness; the evidence shows bureaucratic inertia rather than bad faith. For this reason, Freelain also could not be entitled to the double-backpay liquidated damages relief provided by the FMLA. 29 U.S.C. § 2617(a)(1)(A)(iii) (excluding liquidated damages where violations of the FMLA were in good faith). As a result, all that Freelain could recover in this action would be the compensation due or actual losses incurred. Yet the village has already provided as much. Freelain was eventually made whole for this misclassification by the restoration of his sick leave and by compensation for the unpaid time he spent on administrative leave after exhausting his sick leave.

Freelain argues that despite these points, he still suffered real harm because he had no paid leave remaining when his wife was diagnosed with cancer the month after he returned to work. We do not deny that Freelain faced difficult choices under these circumstances, but neither the FMLA nor the ADA shelters people from these dilemmas. In such circumstances, the FMLA allows employees to take unpaid leave but to return to their jobs. And both laws protect individuals from

firing or suffering material negative consequences for engaging in protected activity. Yet neither law requires employers to provide a single day of paid leave (though as noted the FMLA does require employers to comply with paid leave policies they have voluntarily adopted, 29 C.F.R. § 825.700). Also, nothing in the record suggests that the village knew about Freelain's wife's illness so that this leave classification might be construed as "pouncing on [his] idiosyncratic vulnerabilities." *Washington*, 420 F.3d at 662.

In general, federal courts do not second-guess personnel decisions that lie within the reasonable discretion of employers. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). In Freelain's case, our role is not to examine every leave classification the village created and to dictate how we think it should apply them. In some circumstances, though, additional scrutiny may be justified. Suppose the village as a matter of policy or practice always puts officers undergoing psychological evaluations on administrative leave but did not do so here. Then we might find sufficient evidence that the deviation was a materially adverse action and was circumstantial evidence that a retaliatory or discriminatory motive lay behind the variance. In this case, though, we have no evidence that the village routinely applies its leave classifications differently than it did here.

### 2. *Psychological Examination*

Freelain's claim that the village retaliated against him by requiring a psychological evaluation before he returned to duty also fails. The facts of this case fit safely within the bounds of a permissible medical examination. Our cases show many instances of public safety agencies requiring psychological evaluations of their employees. We have accepted these

measures when they are used to determine a worker's ability to perform work functions safely. E.g., *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565–66 (7th Cir. 2009) (psychological examination ordered for firefighter after colleagues expressed concern about her mental health); *Nichols v. Southern Ill. Univ.–Edwardsville*, 510 F.3d 772, 786–87 (7th Cir. 2007) (paid leave pending psychological examination after officer used force against mentally unstable woman); *Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) ("It was entirely reasonable, and even responsible, for [the police department] to evaluate [the officer's] fitness for duty once it learned that he was experiencing difficulties with his mental health.").

The evidence does not show whether the village had a formal policy dictating when to refer officers for psychological evaluations. Even absent a formal policy, though, the evaluation at issue here could not be considered a materially adverse action. Psychological evaluations are not unusual in circumstances similar to Freelain's, particularly where an employee's failure to do his or her job properly may pose a serious risk to the safety of the employee or others, as the cases listed above show. A reasonable jury could not find that the village acted unreasonably by ordering Freelain to undergo a fitness for duty evaluation after taking several weeks off due to stress-related medical symptoms.

Federal courts see quite a few cases where an issue is whether a police department took adequate measures to address risks of officer misconduct. See *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 989–991 (N.D. Ill. 2017); *Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 813–14, 816 (N.D. Ill. 2006); *McLin v. City of Chicago*, 742 F. Supp. 994, 1001 (N.D. Ill. 1990); see generally U.S. Dep't of Justice, *Investigation of the Chicago*

*Police Department* at 93–134 (2017), https://www.jus-tice.gov/opa/file/925846/download. Though research on the usefulness of psychological assessments in policing does not yield uniform results, deviations in certain personality traits correlate to varying degrees with police misconduct. See Michael J. Cuttler & Paul M. Muchinsky, *Prediction of Law Enforcement Training Performance and Dysfunctional Job Performance with General Mental Ability, Personality, and Life History Variables*, 33 Crim. Just. & Behavior 3, 16–17 (2006). Given the risks posed by an officer who is not well enough to work, the psychological examination of fitness for duty in this case served a legitimate purpose. It could not reasonably lead to a finding that the village retaliated against Freelain or tried to discriminate against him based on a perceived disability.

In dicta, we have outlined certain circumstances where requiring employees to undergo medical examinations would be impermissible. See *Place v. Abbott Laboratories*, 215 F.3d 803, 809 (7th Cir. 2000). For example, a medical evaluation could be seen as a materially adverse action when a plaintiff showed that she was "singled out" for the examination while other individuals in similar situations were not. *Id.* Even without comparators, a plaintiff might show that a medical examination was a materially adverse action if the examination is not related to the employer's justification for ordering it or where a plaintiff has direct evidence that the employer ordered the examination for an illegal purpose. Nothing in Freelain's evidence indicates that the village treated him differently from other officers or singled him out unlawfully for this fitness for duty examination.

### 3. *Delay in Approving Secondary Employment*

The final retaliatory action identified by Freelain is a three-month delay in approving his request for approval of secondary employment. Freelain points to other officers who received this approval more quickly, but he cannot show that the village had a policy or practice of granting approval for secondary employment automatically. The co-worker who sought to hire Freelain for a private security company testified that the village's approval of secondary employment varied, stating, "Well, some officers were getting theirs signed and some officers wasn't."

This highly discretionary and perhaps clumsy process does not present a materially adverse employment action. In a similar case, we examined a police department's decision to forbid an officer from teaching as his secondary employment. *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir. 1999). We rejected the officer's claim that that this decision was retaliatory because the officer had "not proffered evidence that the policy was applied inconsistently or that others were treated more favorably than he was." *Id.* The same holds here. The village retained the authority to approve or disapprove of secondary employment. The approval process took different times for different officers, but we see no evidence that this was materially adverse or that Freelain was singled out for a slow-walk because he exercised his rights under the FMLA and ADA.

### 4. *Causation*

Because the village took no materially adverse actions against Freelain because of his protected activity, we need not address his arguments about evidence of causation. It may be useful, though, to clarify some areas of evidentiary confusion

on the issues. The village and the district court suggested that statements made by Chief Tanksley could not be considered at summary judgment because those statements did not support an inference of causation or because the statements were hearsay. First, Chief Tanksley is an employee of the village, and a senior one at that. The statements he made concerned matters within the scope of his employment. The statements therefore would not count as hearsay and would be admissible if offered by the plaintiff as a statement of an opposing party. Fed. R. Evid. 801(d)(2).

The village also argues that Chief Tanksley's comments would not support an inference of causation. In doing so, the village relies on cases where we have at times suggested that biased comments must be "(1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 661 (7th Cir. 2013), quoting *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007), overruled in part by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The quoted passage from *Teruggi* stated standards for *direct* evidence of unlawful intent. It did not set boundaries for weighing *circumstantial* evidence as part of a larger case.

We have more recently taught that courts considering employment cases must not erect artificial decisional structures for dismissing circumstantial evidence. *Ortiz*, 834 F.3d at 765. "Few discrimination cases are so straightforward—indeed they are often factually complex and require sifting through ambiguous pieces of evidence." *Id.* We repeat our caution that courts should not discard circumstantial evidence simply because it does not provide direct proof of unlawful intent.

5.  *Actions Taken as a Whole*

Finally, Freelain has also asked us to consider all the actions taken against him as a whole. See *Hobgood v. Illinois Gaming Board*, 731 F.3d 635, 644, 647 (7th Cir. 2013). The question is whether reasonable individuals would be dissuaded from exercising their statutory rights due to the employer's actions. Again, the substance of the FMLA governs the result. A reasonable employee in Freelain's shoes should not be dissuaded from taking unpaid leave because an employer took several actions that temporarily depleted his sick leave account while the employee was off work for medical reasons. Perhaps a claim like this can survive when a worker can show insidious deviations from an employer's policies or practices, but Freelain has failed to offer such evidence. The judgment of the district court is

AFFIRMED.